## IN THE MATTER OF THE APPLICATION OF CHI-YOMATSU NAKASHIMA, for a Writ of *Habeas Corpus.*

### January 25, 1907.

*Construction of Immigration Acts—Alien immigrants and alien residents:*

The provisions of the act of Congress of March 3, 1903, "to regulate the immigration of aliens into the United States," apply to alien immigrants, but not to aliens domiciled in the United States who may have temporarily gone abroad and are returning thereto.

*Jurisdiction—Decisions of immigration officers as to the right of an alien to enter the United States—Evidence:*

Although a federal court is without jurisdiction in a case concerning the admission of aliens under the immigration laws, on a question of fact as to the right of an alien to enter the United States, where such question has been decided adversely as to such claim of right by the immigration officers, yet in a case where the essential question of fact as to the admissibility of an alien has not been considered by the immigration officers but they have made an adverse decision based upon irrelevant questions of fact, such a court has jurisdiction to interfere under a writ of *habeas corpus* where the record shows evidence material to the case.

*Immigration Act:*  Petition for writ of *habeas corpus*.

*John W. Cathcart,* Attorney for Petitioner.

*Robert W. Breckons,* U. S. District Attorney, for Respondent.

DOLE, J.   The petitioner, a passenger from Japan to America, was prevented from landing at the port of Honolulu by the acting immigration inspector in charge, and ordered to be deported by the board of special inquiry.   The petitioner states that the alleged reason for such deportation, as he is informed and believes, is that he is an alien immigrant and is suffering from a certain contagious disease known as trachoma, but he denies that he is an alien immigrant or that he was suffering from such disease, and alleges that he is a subject of Japan and that he is, and has been for more than four years, a resident of the United States; that the greater part of such period he has lived at San Jose in the State of California, where he has established a home for himself and his wife and has remained working at his trade of brick-layer; that he was called upon to return to Japan to serve in the army, being a reserve soldier, and that having been discharged he proceeded to return to his home in San Jose and on the way attempted to land at Honolulu for the sake of visiting friends; that his wife is living at their home in San Jose awaiting his return, and that he has no other home than that.   He complains that his

detention is illegal and that he is restrained of his liberty without authority of law.

The return of the immigration inspector in charge recites an inspection by a medical officer who found him afflicted with the disease of trachoma, and that the board of special inquiry affirmed such finding and ordered that he be deported to Japan, and that the petitioner appealed from such decision, which appeal was subsequently dismissed by the Secretary of the Department of Commerce and Labor; that he was within the meaning of the laws of the United States "an alien afflicted with a dangerous contagious disease," and that previous to the decision of the board of special inquiry a hearing was accorded the petitioner on the question of whether or not he was an alien, and upon his admission that he was a subject of Japan, a decision was reached that he was an alien.

The record of the board of special inquiry attached to the return states that the petitioner was ordered to be deported by the board in view of the doctor's certificate and on the ground that he comes within one of the classes of aliens excluded from admission to the United States under section 2 of the act of March 3, 1903, (32 Stat. L., part 1, chap, 1012, p. 1214), "persons afflicted with a loathsome or with a dangerous contagious disease." This return was traversed by the petitioner, denying that any hearing was had before the board of special inquiry on the question of whether or not he was an alien resident of the United States and as such entitled to land, and that no decision was made by such board on that question and that the order of deportation was based on the fact that he is a subject of Japan and upon the certificate of the medical officer.

A paper is filed marked " Exhibit A," purporting to be an examination of the petitioner and is signed by him and sworn to before the inspector, Mr. Brown. This contains a number of questions and answers which show that he was a subject of Japan, had been a resident of Honolulu for one year, where he was employed by a drayman; that he had lived in San Jose,

California, about a year and six months, where his business was that of a farmer; that he was called back to Japan by the government on account of the war; that he did not expect to stay in Japan but intended to return; that when he first came to America he had made up his mind to settle there and that his wife is still at San Jose. No testimony appears in the case in opposition to this examination.

Mr. Breckons, the District Attorney, has filed an elaborate and forcible brief in which he argues that whatever may have been the decisions under the act of March 3, 1891 (26 Stat. L., chap. 551, p. 1084), and other then existing legislation relating to immigration and importation of aliens, the act of March 3, 1903, "an act to regulate the immigration of aliens into the United States," extends the restrictions as to the immigration of aliens to all foreigners, both those migrating into the country and those who have been already domiciled there but have gone abroad and returned with the intention of continuing their residence there, and refers to the opening sentence of the 1st section of the act of 1903, to wit, "that there shall be levied, collected, and paid a duty of two dollars for each and every passenger not a citizen of the United States, or of the Dominion of Canada, the Republic of Cuba or of the Republic of Mexico, who shall come by steam, sail, or other vessel from any foreign port to any port within the United States, or by any railway or any other mode of transportation, from foreign contiguous territory to the United States"; and he cites from the bill expressions which refer generally to aliens without further specification, and argues that the evil sought to be remedied and the danger sought to be avoided by the statute applies with equal force to both resident and alien immigrants; for instance, that a resident alien suffering from a contagious disease would do as much harm in the United States as an alien immigrant, and says, "as the power of Congress to keep out of the country all aliens, whether arriving here for the first time or for the second time, must be admitted, is it unreasonable to say that the word *alien* as used in section

10 means an alien of any description?" Section 10 refers to the finality of the decisions of the board of special inquiry as to the exclusion of aliens who are under the disabilities stated in section 2. It is to be admitted that this act generally in its text uses the word "alien" without specification, in dealing with the matter of the regulation of the immigration of aliens into the United States.

I find on examining the act of March 3, 1891, already referred to, that about the same language is used in reference to the persons to whom the law is applied as in the act of 1903. Section 1 says, "the following classes of aliens shall be excluded from admission," etc. Section 2 refers to the "importation and migration of foreigners." Section 3 refers to the "importation or immigration of any alien." Section 4 refers to the encouragement of the "immigration of any alien." Section 6 refers to the punishment for the bringing in of any "alien" not entitled to land. Section 7 creates the office of Superintendent of Immigration. Section 8 refers to proceedings on the arrival by water of "alien immigrants." This, I think, is the only place in the statute in which the expression "alien immigrants" is used. Section 10 provides for the deportation of "aliens" unlawfully entering. Section 11 refers to "aliens" in the same way.

In the act of 1903, the intention of Congress may be somewhat ascertained by its title, "an act to regulate the immigration of aliens into the United States." Section 1, already referred to in reference to a tax of two dollars on all foreigners coming into the United States, contains the provision that such money shall constitute a permanent appropriation to be called the "immigrant fund." Section 4 forbids the assistance of the "importation or migration of aliens" into the United States. Section 6 uses the same words; also section 7. Section 22 is referred to by the district attorney as not applying to the admission of aliens, but he admits that the term "aliens" used in it refers to immigrant aliens and not to resident aliens. The district attorney argues that section 12 supports strongly his

contention in that it requires a master of a ship bringing "aliens" to the United States, to make a record of whether such aliens have ever been in the United States before, thus showing that whether such alien has been in the United States before or not he is an alien within the meaning of the act. I do not consider that the conclusion that because resident aliens are thus referred to, they are thereby within the meaning of the regulations excluding aliens of certain classes. A long act like this one may, as a matter of convenience, sometimes go outside of its definite subject for a special purpose without necessarily subjecting the matter thus included to all of the provisions of the act. The relation of such matter to the rest of the act will depend on the context. The Congress of the United States constantly exercises such freedom in its legislation, introducing more or less independent statements in the body of acts whose general purpose is something quite different; for instance in the statute under consideration,—for the regulation of the immigration of aliens, appears the following regulation in section 34: "that no intoxicating liquors of any character shall be sold within the limits of the capitol building of the United States." Moreover, it may well have been the intention of Congress in requiring masters of vessels bringing aliens to the United States to state in the manifest whether such aliens were ever before in the United States, "and if so when and where," to thus make a distinction between "resident" and "immigrant" aliens, with the object of simplifying the work of the immigrant inspectors.

In construing a statute it must be generally taken as a whole, and those parts which are vague interpreted in the light of the context and the purpose of the statute. I do not find any departure in the act of 1903 from previous legislation on the question as to its application to resident aliens. The statute of 1891 only once uses the expression "alien immigrants." The statute of 1903 refers constantly to the importation and immigration of aliens. The officers designated for carrying out the statute are defined as immigration officers and inspectors.

The head of the bureau is known as the Commissioner General of Immigration. I find nothing more in support of the contention of the respondent in the words of the act of 1903 than I find in the act of 1891.

The following citation from the case of *Moffitt v. United States,* 128 Fed. Rep. 375, 380, throws a great deal of light on the question of the construction of the act of March 3, 1903, as well as of the previous acts in relation to the point at issue, and strongly supports the conclusions of the cases mentioned:

" The standard dictionaries give the meaning of the word 'immigrant': 'A person that removes into a country for the purpose of permanent residence.' 'Immigrate': 'To remove into a country for the purpose of permanent residence.' 'Immigration': 'The passing or removing into the country for the purpose of permanent residence.' See Webster's Dictionary and Century Dictionary. This meaning should be applied to the words as used in the statute in order to discover the intent of Congress. This interpretation has been given by the courts to the language used in the act under consideration."

The act of 1891 and other statutes in force at that time regulating immigration, have been construed in a number of decisions. In seven cases tried in the federal courts under the provisions of these previous acts it was decided that such legislation did not include aliens who having acquired a domicil in the United States, had temporarily gone abroad and were returning thereto. These cases are, *United States v. Sandrey,* 48 Fed. Rep. 550; *In re Panzara,* 51 Id. 275; *In re Martorelli,* 63 Id. 437; *In re Maiola,* 67 Id. 114; *In re Ota,* 96 Id. 487; *United States v. Burke,* 99 Id. 895, and *Moffitt v. United States,* 128 Id. 375. The latter case was brought under the act of 1891 but was decided after the enactment of the act of 1903, which was referred to in the decision. In two cases the federal courts have adopted the same view as to the application of the provisons of the act of Congress of March 3, 1903, regulating the immigration of aliens into the United States. These

are *In re Buchsbaum,* 141 Fed. Rep. 221 and *United States v. Aultman & Co.,* 143 Id. 922.

The fact that Congress, after previous legislation on this subject had been construed by the federal courts in numerous cases, and all in the same way on the point at issue, has enacted a general act regulating the immigration of aliens without expressing any definite intention of a departure from the meaning of the previous legislation as construed by the courts on the point, is a strong argument against the contention of the respondent in this case. In the case of *United States v. Aultman & Co.,* supra, page 928, the court said, referring to cases under previous legislation:

"Since that time the law has been amended, especially by the act of March 3, 1903; and it is a familiar principle that when a certain construction has been given to a statute, especially when its general language has been qualified, and subsequent legislation has not undertaken to change the language so as to meet with the judicial definition, added persuasiveness is given to the constrution of the law which the courts have put upon it. That is to say, that if Congress intended to give a wider application to the law than the courts have given to it, it is reasonable to assume that it would have so legislated when it came to amend the law after the decisions were made public."

Counsel for the respondent refers to the *Ju Toy case,* decided in 1905, 198 U. S. 253, in regard to the jurisdiction of the court to consider a question of immigration which has been disposed of by the federal immigration officers. I do not see that it applies to the present case, it appearing by the record in this case that the decision was based on the mere fact of the petitioner's being an alien without regard to the fact, as claimed, that he is an alien resident. This court derives jurisdiction to try the case under *habeas corpus* proceedings from the fact, as shown by the record, that the immigration officers never considered the question whether the petitioner was an alien immigrant or alien resident, but disposed of the case solely on the ground that he was an alien; whereas, according to the sub-

stantially unanimous decisions of the federal courts and the law as found by this court, a person seeking to enter the United States who is an alien resident, is not within the immigration laws and may not be excluded. If the immigration officers had considered that question and decided that the petitioner was not an alien resident but an alien immigrant, such decision would have been final, and this court would have been without jurisdiction in the case.

The petitioner is discharged subject to the taking of an appeal, in which case he may be released upon giving a recognizance with surety in an amount to be fixed by the court to answer the judgment of the appellate court.

---

*Affirmed on appeal*: See *United States v. Nakashima*, 160 Fed. 842.